GRASBY v. FINDLEY.

4-5584                              132 S. W. 2d 379

Opinion delivered October 23, 1939.

John W. Atkinson and E. R. Parham, for appellants.
William W. Shepherd, for appellees.

GRIFFIN SMITH, C. J. Mrs. Flora Richard Martin had, for a number of years, owned property in Requa's Suburban Park Addition to the city of Little Rock, including Lots 2 and 3, which are involved in this suit.

Mrs. Martin's home was near the north end of Lot 2. The south ends of the lots abut the northern extrem-

ity of the right-of-way of the Little Rock-Hot Springs highway, each lot being 262.8 feet in width on the south end. The west boundary line of Lot 3 is 732½ feet, while the east line of Lot 2 is 717½ feet in length—a difference of 15 feet. This is due to the gradual widening of the addition until the west line of Lot 4 is reached, at which point the north boundary, in continuing west, takes a slight southwesterly course.

During the time Mrs. Martin occupied Lot 2 as her home she erected a fence, along which climbing roses were planted. The point of beginning, with respect to the fence, is 61.2 feet west of the southwest corner of Lot 2. The fence runs in a northeasterly direction until it intersects with the west line of Lot 2, near which point an east-west hedge is planted. This hedge is referred to in appellants' brief as being "parallel with the south property line."

Mrs. Martin had mortgaged Lots 2 and 3 to Union Trust Company of Little Rock. Thereafter, on August 19, 1932, the bank quitclaimed to W. W. Findley all of Lot 2 and a part of Lot 3,[1] the description being by metes and bounds. The property identified included a strip off the east side of Lot 3, in width 36 feet at the north end and 37.2 feet at the south. The description is copied in the margin.[2] In the same instrument Mrs. Martin and her husband joined in warranting the title to Findley.

April 3, 1935, the mortgage of Union Trust Company was foreclosed, the commissioner in chancery

---

[1] In the conveyance the lots are referred to as blocks.

[2] "Beginning at a point of intersection of the boundary line between said blocks, said point being on the north side of the Hot Springs highway, running thence north a distance of 725 feet along the said boundary line to the point of intersection with the north boundary line of said blocks 2 and 3, thence west along the north boundary line of said block 3 a distance of 36 feet, thence south to a point of intersection of said line with the south boundary line of said block 3, said point being on the north side of the Hot Springs highway a distance of 37.2 feet from the point of beginning, thence east 37.2 feet to point of beginning."

thereafter conveying to Marion Wasson, state bank commissioner. This description, also, is shown in the margin.[3]

April 8, 1936, Wasson conveyed to Mrs. Martin the following lands: "Beginning at a point of intersection of the boundary line between said blocks, said point being on the north side of the Hot Springs highway, running thence north a distance of 725 feet along the said boundary line to the point of intersection with the north boundary line of said blocks 2 and 3, thence west along the north boundary line of said block 3 a distance of 36 feet, thence south to a point of intersection of said line with the south boundary line of said block 3, said point being on the north side of Hot Springs highway a distance of 37.2 feet to a point of beginning."

It will be observed that the excepted part of what was formerly Lot 3 was that portion described by metes and bounds in the commissioner's deed of April 3, 1935, being the strip 36 feet wide on the north end and 37.2 feet wide at the southern extremity.

March 18, 1938, Leonard S. Goodman, trustee (to whom the title had passed) conveyed Lot 3 (except the 36-37.2-ft. strip) to appellants.

May 4, 1938, Findley filed his complaint, alleging that he was owner of Block 2 and that part of Block 3 lying east of what was termed an established fence, and also east of an established water line, electric light poles, a hedge, and rose bushes. Contention was that he was entitled to a fractional strip carved out of Block 3, measuring 66.2 feet in width on the front or south end, and 36 feet wide at the north end; that the defendants threat-

---

[3] "All of block 2 and that part of block 3 more particularly described as follows: Beginning at a point of intersection of the boundary line between said blocks, said point being on the north side of the Hot Springs highway, running thence north a distance of 725 feet along the said boundary line to the point of intersection with the north boundary line of said blocks 2 and 3, thence west along the north boundary line of said block 3 a distance of 36 feet, thence south to a point of intersection of said line ·with the south boundary line of said block 3, said point being on the north side of the Hot Springs highway a distance of 37.2 feet from the point of beginning, thence east 37.2 feet to point of beginning."

ened to take possession of this strip and were preparing to remove the so-called division fence, pipe line, light poles, rose bushes, etc.

It was further alleged that defendants were constructing a tourist camp and filling station on the western part of Block 3, in violation of restrictions running with the land which confined its use to residential purposes. There was an allegation that the tourist camp would constitute a nuisance.

In their answer the Grasbys deraigned their title, claiming all of Lot 3 except the 36-37.2-ft. strip. They alleged that Mrs. W. W. Findley was a necessary party; denied that erection of a tourist camp would constitute a nuisance; alleged that construction operations on Block 3 were terminated in consequence of a restraining order procured at the instance of W. W. Findley, and that by reason of delays, etc., they were damaged $720, for which judgment was asked.

The Martins intervened, and with W. W. Findley they alleged that Union Trust Company had no substantial interest in the controversy; that Flora R. Martin was the real owner at the time of the sale to Findley, having been represented in the negotiations by her husband; that at the time of the sale no survey of the property was made; that the fence, light poles and rose bushes along the boundary line [beginning at a point 61.2 feet west of the southwest corner of Lot 2] constituted the boundary line on the west [of Lot 2] and that the location had been so identified for many years before the sale to Findley; that they intended to sell Findley all of the property embraced within their home place and represented to him that the fence, electric light poles, rose bushes, etc., were on the division line; that the intent was that Findley should purchase the ground to the fence and rose bushes; that the line was stepped off as best they could and measurements were given to the scrivener who prepared the deed, and that they believed the measurements embraced all of the front yard and the incidental property then being used as the Martin home place.

It was further set out that within two weeks following Grasby's claim, they caused the land to be surveyed and discovered the error in measurements; that the deed fell short by 29 feet (on the south end) of embracing all the property to the rose bushes, and that the deed should be reformed to correctly describe the land intended to be conveyed. The prayer was that the deed of Union Trust Company be permitted to stand as written, but that the conveyance by warranty executed by the Martins be reformed in accordance with the intentions of the parties.

The chancellor decreed reformation except as to 4½ feet, effect of which was to exclude from the conveyance to Findley the western boundary fence, rose bushes, light poles, wires, and water line; and as to this strip of ground appellees have cross-appealed. Judgment was also given in Grasby's favor for $114.20 as damages on account of wrongful issuance of the restraining order.

It is insisted by appellees that Mrs. Martin sold, and that appellees bought, "all of the land in the front yard between the two division fences, and [that] the decree should be affirmed with respect to the reformation order."

It appears from the record that Mrs. Martin's sale to Grasby was consummated approximately six years after she had sold to Findley. The latter went into possession and assumed that his south boundary line extended farther west than it did. He was under the impression, and no doubt honestly so, that the western extremity of his property was not 300 feet west of the southeast corner of Lot 2, as the deed exemplified, but that it was 329 feet from such point. Effect of appellees' contention, if sustained, would permit them to retain a wedge-shaped strip of land 29 feet in width fronting the highway, but gradually diminishing to non-existence at a point north of the center of the boundary line between Lot 3 and the 36-37.2-ft. strip added to Lot 2 in order that the Martin home place should be 300 feet wide on both the north and south ends.

Do the facts and circumstances justify reformation?

1020

When appellants purchased Lot 3, appellees were in possession under a recorded deed which showed the exact property appellees were supposed to have bought. There was nothing on the face of the transaction to indicate that the wedge-shaped strip of land within the Findley curtilage was a part of the grant to Findley. Conversely, appellants purchased under specific descriptions covering all of Lot 3, except the strip added to Lot 2 for the purpose of making the latter 300 feet in width.

Martin, after stating that he represented his wife in making the sale, testified that the question was raised (and presumably Findley raised this question) as to where the line would run; that he (Martin) stepped off the distance by walking on the Nineteenth Street Pike "because it was boggy and soggy on the property;" that he stepped off the number of feet they wanted to sell Findley, and a question arose regarding the rose bushes. Continuing, Martin said:

"I stopped on the east side about three or four feet and put down the number of feet I had stepped so as to retain the rose bushes. So far as the 29-foot strip was concerned, I had no intention of deeding it to Mr. Findley or anyone else. I took the figures on a piece of paper to the bank for the drafting of the deed. I showed the fence to Mr. Findley and did not tell him that the line, measured by the steps, was to include the rose bushes. We had intended to change the plat and have the line made according to the fence if we had kept the property. I stepped off and sold to Mr. Findley according to so many steps and so many feet. It was not surveyed."

It may be urged that when the Grasbys purchased fractional Lot 3, they did so with notice of defined lines on the east side, and are therefore bound to accept such monuments as designating the eastern extremity of their property, in spite of the fact that their deed called for the very land in controversy. There is no evidence, however, that at the time of purchase, or before, the Findley claims were brought to appellants' attention. In this circumstance they had a right to expect, and they may demand, property conformable to the descriptions

contained in their deed. The result of this determination gives to each party the land described in the conveyance.

Appellees do not question the judgment for $114.20, and it is affirmed. That part of the decree reforming the Findley deed is reversed. The cause is remanded with directions to quiet title in appellants as to all of Lot 3 except the 36-37.2-ft. tract herein identified, but reserving to appellees an easement across the eastern portion of that part of Lot 3 as agreed to by the parties under a recitation in the decree.